# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE

Assigned on Briefs April 14, 2020

## STATE OF TENNESSEE v. HUMBERTO MORALES, MARIO GARCIA FLORES, AND KEYONA MARTINA NEWELL

**Appeal from the Circuit Court for Williamson County
Nos. II-CR-068090-C, II-CR-068090-D, II-CR-068090-E     Deanna B. Johnson, Judge**

_____

### No. M2019-00435-CCA-R3-CD

_____

The Defendants, Humberto Morales, Mario Garcia Flores, and Keyona Martina Newell, (collectively "the Defendants") were convicted of aggravated robbery, two counts of aggravated burglary, theft of property valued at $1,000 or more, and conspiracy to commit aggravated robbery. Mr. Flores also was convicted of possession of a firearm during the commission of a dangerous felony and employment of a firearm during the commission of a dangerous felony. After merging various convictions, the trial court ordered Mr. Morales to serve an effective sentence of forty-eight years, Mr. Flores to serve an effective sentence of thirty years, and Ms. Newell to serve an effective sentence of twenty-four years. On appeal, the Defendants, either collectively or individually, challenge: (1) the sufficiency of the evidence supporting the convictions; (2) the trial court's denial of a motion to suppress based upon the constitutionality of the stop of the vehicle in which some of the perpetrators fled the scene; (3) the trial court's denial of a continuance based upon the State's late disclosure of discovery materials; (4) the trial court's decision to admit expert testimony of evidence extracted from the perpetrators' cell phones; (5) the trial court's denial of Mr. Morales's motion for mistrial after Ms. Newell's counsel questioned a witness about evidence that the trial court previously ruled to be inadmissible; (6) the trial court's failure to issue an accomplice instruction; and (7) the trial court's imposition of consecutive sentences. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Eric M. Larsen, Franklin, Tennessee, for the appellant, Humberto Morales.

Cayley J. Turrin, Brentwood, Tennessee (on appeal), and Jonathan Turner, Franklin, Tennessee (at trial), for the appellant, Mario Garcia Flores.

Nichole Dusche (on appeal) and Sandra Wells (at trial), Franklin, Tennessee, for the appellant, Keyona Martina Newell.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Kim R. Helper, District Attorney General; and Tammy Rettig and Terry Wood, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

The Defendants, along with the co-defendants, Mr. Maurice Chapman, Ms. Emily Faulkner, and Ms. Elizabeth Pittman, were charged with various offenses in connection with the home invasion and robbery of the victim, Mr. James Reece Ewton, on February 26, 2014, in Franklin, Tennessee. The State tried Mr. Morales, Mr. Flores, and Ms. Newell together, and Ms. Faulkner testified for the prosecution. The State presented evidence at trial that Mr. Morales planned the home invasion, along with Ms. Pittman, the victim's former girlfriend. Mr. Flores, Ms. Newell, Mr. Chapman, Ms. Faulkner, and a man identified as "Raoul" conducted the home invasion and took numerous items from the victim's home while holding the victim at gunpoint. They fled in a van and led police officers on a chase to an apartment complex in Nashville where all but Ms. Faulkner jumped out of the van and fled on foot before the van crashed into a light pole. Police officers were able to apprehend and arrest all of the participants of the home invasion except for Raoul. Mr. Morales was arrested during a traffic stop several days later. The van contained items from the victim's home, but many of the items were damaged when the van crashed.

### The State's Proof at Trial

The victim, who worked out of his home in Franklin, testified that at 8:00 or 9:00 a.m. on the morning of the home invasion, he and his neighbor exchanged text messages about meeting for coffee. As the victim was getting into the shower prior to the meeting, he heard the doorbell ring but chose to ignore it because he believed a sales person was likely at his door. Following his shower, he entered his bedroom located downstairs to put on his clothes and heard the "door chime," which indicated that someone was

- 2 -

opening the front door. Assuming his neighbor had entered his house, the victim yelled, "Hello."

The victim testified that a man entered his bedroom and pointed a black revolver at him. The victim described the man as Hispanic with dark hair, a dark complexion, a smaller frame, and what appeared to be acne scars on his face. The man was wearing a light-colored shirt, light gray khaki pants, and gray shoes. The victim was able to see inside the gun as the man was pointing it in his face and stated that the gun was loaded with copper, hollow point bullets. The victim was naked, unarmed, and afraid.

The man ordered the victim to get on the ground and told the victim either that someone had a problem with the victim or that the victim had made someone angry. The victim noted that the man did not have "much of an accent." The man motioned for the victim to go into the bathroom and ordered him to get down on the ground, and the victim complied. The man then ordered the victim to go into the attached closet, and the victim crawled into the closet and laid down on his stomach.

The victim testified that another man, who appeared to be Hispanic, entered the room. The victim described the man as having a small frame and wearing a hoodie with the word "Affliction" on it. The victim later testified that the man also was wearing a plaid mask. The man did not appear to speak English, and he and the first man spoke to each other in Spanish while pointing a gun at the victim's head. The two men used ties from the victim's tie rack to bind the victim's hands and feet. At one point, the man wearing the plaid mask pulled the hammer back on the revolver.

A third man also entered the closet. The victim described the man as wearing a dark shirt, dark pants, a black hoodie, and a black mask with dreadlocks sticking out from underneath the mask. The victim stated that the man appeared to be speaking to someone either on a cell phone or through "earbuds." The man appeared to be listening to someone and then said, "[U]p top, up top, up top." The victim believed the men were searching for his Colt AR-15 rifle that he kept in a gun case on the top shelf of his closet. The victim said the men knew exactly where the rifle was located. The man in the black mask grabbed the gun case off the shelf, removed the rifle, pointed it at the victim's head, and demanded to know the location of the victim's safe, watches, and cash. The victim stated that the man seemed to be attempting to mask his voice. The victim told the man that the safe was located upstairs.

The men took from the closet ammunition and two gun boxes containing a .22 caliber rifle and a .22 caliber pistol and loaded them into a green backpack. The three men pulled the victim up and walked him to the stairs. The victim was naked, and his hands and feet were bound. He testified that while walking to the stairs, he looked

- 3 -

around and saw that his living room was "destroyed," that his television was missing, and that his belongings were "all over the place." The victim saw a "heavier set," Caucasian woman, who had blonde hair and was wearing a blue shirt, standing at the front door. The victim saw another person with a white covering over his or her face standing at the front area of the house.

The men took the victim upstairs to the guest bedroom, pushed him down on the ground, and demanded to know the location of the key to his safe. The victim told them that the key was in the top drawer of the dresser. The man in the black mask gave the key to the unmasked man, and they went into the closet where the safe was located while the man in the plaid mask stood outside the closet with a gun.

The victim heard doors slamming and items breaking, and at one point, he heard someone in the attic. During the commotion, the men grabbed a bib from the playroom of the victim's daughter, stuffed it into the victim's mouth, and tied a shirt around the bib to hold it in place, which made it difficult for the victim to breathe. At one point, the man in the plaid mask removed a hollow point bullet from the revolver and showed it to the victim in an effort to intimidate him. After the three men left the guest bedroom, the victim heard people making noise downstairs, and then it became quiet.

The victim testified that once he believed the intruders had left, he was able to untie his hands and removed the shirt from around his mouth. He walked around the house to make sure that everyone had left and noticed that his front door was open. He cut the tie from around his legs using a knife from the kitchen and then put on his clothes. The intruders had taken both of his iPhones, so he ran to the home of his neighbor, Mr. Simon Shelton, to call the police.

The victim told Mr. Shelton that he had been robbed and to call the police. The victim testified that he was "freaked out" and "terrified." Mr. Shelton called 911, and they used the "Find My iPhone" program to track the location of the victim's iPhone that had been taken by the intruders. They relayed the location of the iPhone to the 911 operator. The victim told the operator that one of the intruders had dreadlocks and described various items that were taken, including the guns. The victim never saw the vehicle in which the intruders fled. Police officers came to Mr. Shelton's home and accompanied the victim back to his house to conduct a walk-through.

The victim testified regarding the items taken from each room in his home and the estimated cost for each item. A Fender Stratocaster guitar and Guild bass were taken from the dining room, and while they were later returned to the victim, they were damaged when the van in which the intruders fled wrecked. Two MacBook laptops, at an estimated cost of almost $2,000 each; an iPhone, at an estimated cost of $500 to $700; an

iPod, at an estimated cost of $200; several hard drives; and his personal checks were taken from his office. Officers later gave these items back to the victim, but the laptops and hard drives were damaged. The victim's wallet, containing $400 to $500 in cash, and his Rolex watch, with an estimated cost of $8,000, were taken from the kitchen. The watch was later returned. Items taken from the victim's living room included a Samsung forty-six-inch LED 3D television, for which he paid around $2,600, and a sound bar and subwoofer, for which he paid around $150 each. Although officers later returned the items to the victim, he was unable to use them because the items were damaged in the collision. Items taken from his downstairs closet included an AR-15 rifle for which he paid around $1,600, a gun for which he paid $1,200, and another gun for which he paid $400 to $500, and these items were later returned to the victim. A Samsung forty-six-inch LED television with an estimated cost of $2,600 and an X-Box game console with an estimated cost of $300 to $400 were taken from the upstairs guest bedroom. Although the items were later returned to the victim, they were damaged and no longer operational. The intruders took a Rolex watch with an estimated cost of $5,500, cash in the amount of $2,000, and two pistols with an estimated cost of $700 to $800 each from the safe, and of these items, only one of the pistols was returned. The intruders also took approximately $1,000 worth of ammunition, which the police later returned to the victim. Lastly, the intruders took a Vizio television for which the victim paid $200 to $300 from his daughter's bedroom, and although the television was later returned, it was damaged.

The victim testified that his garage could be accessed through either an electric garage opener or a code box. Inside his garage was an access door to enter his home. Only his neighbors, who occasionally watched his dogs, and Ms. Pittman knew the code. On several occasions while they were dating, Ms. Pittman stayed at his home and watched his dogs when he was traveling, and she was familiar with the interior of his home. The victim testified that following the home invasion, he suspected that Ms. Pittman was involved because she was the one person who knew about the items in his home. He ended his relationship with Ms. Pittman in September or October of 2013, four or five months prior to the home invasion, due to her drug use. The victim did not recognize any of the Defendants at trial.

On cross-examination, the victim testified that the Hispanic man who was not wearing a mask and who initially entered his bedroom was not one of the Defendants at trial. The victim stated that he assumed that this man was in charge or in control of the home invasion at that time, but the victim did not know whether the man was in charge of planning the home invasion. He also stated that while he recalled seeing someone wearing an "Affliction" shirt, he did not recall which of the intruders was wearing it. The victim identified Ms. Faulkner at the preliminary hearing as the woman whom he saw standing beside the front door.

Mr. Shelton testified that sometime after he and the victim exchanged text messages about meeting for coffee on the morning of the offenses, the victim "kind of busted through the front door" while looking frightened and stated that he had been robbed at gunpoint. Mr. Shelton dialed 911 while the victim used his computer to log onto the "Find My iPhone" application in an effort to track his iPhone. Both Mr. Shelton and the victim spoke to the operator, reported what had occurred, and tracked the location of the victim's iPhone for the operator. Once police officers arrived, the victim returned with them to his home, while Mr. Shelton continued to speak to the operator.

Detective Amy Cole with the Williamson County Sheriff's Department testified that she received a be-on-the-lookout alert ("BOLO") from dispatch stating that a home invasion and armed robbery occurred in Franklin during which guns were stolen. According to the dispatch, the suspects included a Caucasian female and Hispanic males, one of whom had dreadlocks. The dispatcher stated that an iPhone had been taken during the home invasion, that the victim was using an iPhone locator application to track his iPhone, and that the cell phone was "pinging" in different locations on Interstate 65 ("I-65"). Detective Cole parked her unmarked, silver Ford Explorer on the side of I-65 North and listened to the dispatcher update the locations of the pings.

When the iPhone pinged close to the location where Detective Cole was parked, she merged into traffic and drove slowly in an effort to observe the vehicles passing her. She stated that she was searching for a vehicle with multiple occupants, including a Caucasian woman and a person with dreadlocks. A white van that was traveling at a slower speed than other traffic on the interstate passed Detective Cole, and she saw a Caucasian woman sitting in the front passenger seat wearing a scarf on her head and almost completely across her face. Detective Cole began following the van and reported the van's tag number to the dispatcher. The van was registered to Christian Colmenares.

The van had several windows, allowing Detective Cole to observe the occupants. She stated that the occupants in the back of the van would lie down, rise up, and then lie down again and that one of the occupants appeared to have dreadlocks. She continued to update the dispatcher regarding her location and her observations. Detective Cole testified that she requested assistance from marked patrol cars to stop the van.

Brentwood Police Officer Raymond Placentia testified that he responded to a dispatch communication of a home invasion involving five suspects who were fleeing in a vehicle traveling northbound on I-65. He heard a radio transmission of officers following a white van that had exited I-65 onto Old Hickory Boulevard and then determining that the white van was not involved. Officer Placentia stated that as a result of the transmission, he assumed that he was searching for a white van. He continued traveling on I-65 until he got behind a white van exiting onto Harding Place. He

provided the dispatcher with the license plate number of the van, and the dispatcher confirmed "that was the car involved." Officer Placentia noticed that the occupants were two African-American people, two Hispanic people, and a Caucasian woman. Officer Placentia testified that "based on the totality of the circumstances," he believed that the van was involved in the home invasion.

Officer Placentia saw the vehicle in which Detective Cole was driving, and Detective Cole moved out of the way to allow the officer to initiate a traffic stop. Once Officer Placentia heard additional officers behind him, he activated his blue lights to initiate a traffic stop. The van did not stop, and police officers pursued the van through several streets in Nashville. Officer Placentia testified that the occupants in the back of the van were moving around and did not appear to be wearing their seatbelts. Officers pursued the van to an apartment complex where four of the occupants, including the driver, jumped out of the van and fled while the van was still in motion. The van collided with a light pole at the end of the parking lot. The fifth occupant, described as a heavy-set, Caucasian woman, exited the vehicle, began to run, and was apprehended by a police officer. Detective Cole testified that the woman was the front-seat passenger whom she had observed with a scarf wrapped around her head.

Officer Placentia chased the driver, whom he identified at trial as Mr. Flores, into the courtyard area and to the back of the parking lot. As Mr. Flores was running, he reached into his pocket, pulled out a diskette, and threw it on the ground. Once Officer Placentia got close to Mr. Flores, the officer ordered Mr. Flores in both English and Spanish to get on his knees and to raise up his hands, and Mr. Flores complied. Officer Placentia patted down Mr. Flores to ensure that he did not have a gun and handed him off to another police officer. Officer Placentia retrieved the diskette that Mr. Flores discarded and gave it to another officer. Other officers later found checks from the victim's checkbook in Mr. Flores's possession.

Officer Placentia assisted his partner, Officer Kalap Andres, in chasing an African-American man with dreadlocks who was wearing a gray shirt and gray pants and identified at trial as Mr. Chapman. Officer Andres told Officer Placentia that the man had fled into an apartment. The officers subsequently were able to apprehend Mr. Chapman after he ran through the parking lot and climbed over a fence. Williamson County Sheriff's Deputy Telayna Luttrell testified that a Samsung flip phone was in Mr. Chapman's possession and that a pile of clothing, which included a jacket and a black knit cap with two slits that appeared to be holes for eyes, was found on the ground near him. Officers collected a black shirt and a pair of black cotton gloves that were wrapped inside of a dark sweatshirt from the ground near the door of the apartment where Mr. Chapman had been hiding.

Brentwood Police Officer William Frasch apprehended Ms. Newell, who he described as a heavy-set, African-American woman who had dreadlocks and was wearing a gray jacket. Ms. Newell was cooperative and did not appear to be impaired or injured. Officers searched Ms. Newell and found a cell phone, a pair of black gloves, and a white ski mask with holes cut out for the eyes.

Franklin Police Detective David Dixon responded to the apartment complex and found a cell phone and a brown wallet that contained $600 in cash and the victim's identification lying on the ground on the left side of the van. He also collected a pair of black tennis shoes lying in the parking lot at the rear of the van. Franklin Police Detective Richard Spaulding and Detective Dixon searched the van in the vehicle examination bay at the police department. The detectives located a Smith and Wesson revolver with rounds in the chamber on the floorboard between the driver's seat and the passenger's seat. Detective Spaulding testified that he did not process the revolver for fingerprints because the victim reported that all of the intruders were wearing gloves. A paper with handwritten directions to the victim's home and a clipboard with a sheet of paper and a pen attached also were found between the driver's seat and the passenger's seat. The detectives also located a receipt for a hotel with Mr. Morales's name inside the van. They recovered numerous items that belonged to the victim, including televisions, an AR-15 rifle, laptops, and a watch. Detective Spaulding acknowledged on cross-examination that all items found in the van that were identified as belonging to the victim were returned to him.

On March 1, 2014, Officer Joshua Brownlee of the Lebanon Police Department stopped Mr. Morales for speeding in his Toyota Corolla. Officers later searched Mr. Morales's car pursuant to a search warrant and found paperwork, including a social security card, with Mr. Morales's name on it. A holster for a revolver and a Samsung cell phone were found in the front passenger seat. Officers were unable to lift any fingerprints from the holster. Detective Spaulding testified that the revolver found in the van appeared to fit the holster.

Ms. Emily Faulkner agreed to cooperate and testified for the State at trial. She testified that she and Mr. Morales, who she knew as "Luper," met on a social website and had seen each other in person approximately five times. Prior to the home invasion, Mr. Morales sent her a text message asking to meet with her. During the meeting, Mr. Morales asked her to participate in the home invasion by knocking on the victim's door. He asked her to dress in a "professional" manner so that the victim would open the door. Ms. Faulkner stated that the plan was that when she knocked on the door and the victim opened it, those with her would go inside and take the victim's belongings. Mr. Morales promised to pay her "a few thousand dollars" for her participation.

- 8 -

Ms. Faulkner testified that the day before the home invasion, Mr. Morales drove her to Walmart in a small, four-door, "gold-ish, tan-ish" car. Mr. Morales purchased for Ms. Faulkner a pair of high-heeled shoes and a scarf to cover the tattoos on her neck. Upon leaving Walmart, they went to a hotel located off Harding Place where Mr. Morales had rented a room for Raoul. Mr. Morales instructed Ms. Faulkner to meet back at the hotel the following morning at 7:00 a.m. He told her to knock on the door to the hotel room that he had rented and that Raoul would come to the door and let her inside. Mr. Amish Patel, the general manager of the hotel, testified that according to his records, Mr. Morales checked in on February 23 and checked out on March 2, 2014. Mr. Patel stated that employees are prohibited from renting a room to anyone who does not produce a form of identification.

Ms. Faulkner testified that she arrived at the hotel room the following morning earlier than she was supposed to arrive. She knocked on the door, and Raoul let her inside. There were two beds, and Ms. Faulkner laid down in one bed while Raoul laid down in the other one. Ms. Faulkner said she fell asleep because she had been awake all night. When she awoke, three other people were in the room: Mr. Flores, who she knew as "Christian," Ms. Newell, and an African-American man with dreadlocks, whose name she did not know but who had been identified by others at trial as Mr. Chapman. Mr. Morales had not yet arrived, so Ms. Faulkner went outside, smoked a cigarette, and sat in her car.

Ms. Faulkner returned to the room once Mr. Morales arrived. Mr. Morales handed a yellow piece of paper to Mr. Flores, which Ms. Faulkner believed to have directions written on it. She later saw Mr. Flores with the piece of paper in the van. Mr. Morales also gave everyone a pair of gloves, which Ms. Faulkner described as soft, "cheap," and either black or brown. Mr. Morales gave Mr. Flores and Raoul each a handgun, and another man arrived at the hotel. She stated that Mr. Morales gave Mr. Flores and the man the victim's address, which both Mr. Flores and the man entered into their cell phones. The man left to go to the address to ensure that "it was clear," and Mr. Morales drove away in his Toyota car.

Ms. Faulkner testified that she, Mr. Flores, Raoul, Ms. Newell, and Mr. Chapman got into a white van. Mr. Flores was the driver; Ms. Faulkner sat on the front passenger's side; and the remaining people sat in the back of the van. Ms. Faulkner was wearing gray dress pants, a black shirt, a jacket, high-heeled shoes, and a scarf. Mr. Morales had stated that Ms. Faulkner needed additional items to look like a business woman, so they stopped at a Walmart where she and Mr. Flores went inside and purchased a clipboard, paper, and a pen. Mr. Flores paid for the items. They also stopped at a convenience store and purchased gasoline. While on their way to the victim's home, Ms. Newell and Mr. Chapman converted their hats into masks by making holes for their eyes.

Ms. Faulkner said Mr. Flores used the GPS on his cell phone to find the victim's home. Once they arrived in the neighborhood, they were not sure which house belonged to the victim. Mr. Flores made a call and appeared to speak in Spanish, and shortly thereafter, they located the victim's home. A black Jeep was parked in the driveway. Mr. Flores backed the van into the driveway to make it easier for them to load the items from the house into the van.

Ms. Faulkner testified that prior to leaving the hotel room, she, Mr. Flores, and Mr. Morales had discussed the plan to gain entry. Ms. Faulkner was to ring the doorbell and look like a "professional" so that the victim would open the door. Mr. Flores was supposed to stand to Ms. Faulkner's side with a gun and then point the gun at the victim when he opened the door. Ms. Faulkner testified that she knocked on the door while Mr. Flores stood on her left side with the gun in his waistband, but the victim did not come to the door. Ms. Faulkner continued knocking and ringing the doorbell. When no one came to the door, Ms. Faulkner and Mr. Flores returned to the van, and Mr. Flores said he was going to call Mr. Morales. After the call ended, Mr. Flores gave Mr. Chapman a code to gain entry to the home. Mr. Flores also handed him a gun, but Mr. Chapman refused to take it and instructed Mr. Flores to give it to Ms. Newell. Ms. Newell took the gun from Mr. Flores. Mr. Chapman and Ms. Newell got out of the van and went to a gate behind the Jeep. The front door to the house then opened, and Mr. Chapman was standing at the door.

Ms. Faulkner, Mr. Flores, and Raoul went to the front door where Ms. Newell gave the gun back to Mr. Flores. Mr. Chapman pointed to a door and said, "[H]e's in there." Mr. Flores and Raoul entered the room, while Ms. Faulkner, Ms. Newell, and Mr. Chapman began removing items from the home. Ms. Newell and Ms. Faulkner took a television off a wall in the living room and set it on a couch. Ms. Faulkner looked through cabinets in the living room, while Ms. Newell searched drawers in the kitchen. Ms. Faulkner stated that she recalled Mr. Morales mentioning Rolex watches as items that would be in the house.

Ms. Faulkner and Ms. Newell went upstairs where Ms. Newell removed a television off a wall and Ms. Faulkner grabbed a small television from a child's bedroom. While Ms. Faulkner was upstairs, she saw Mr. Chapman standing on the stairs of a trap door attic while talking on his cell phone. Ms. Faulkner and Ms. Newell loaded three televisions, a guitar, and multiple small cases into the van. They remained in the van until Ms. Newell received a call. After the call ended, Ms. Newell told Ms. Faulkner to "come on," and they reentered the house.

As Ms. Faulkner was standing by the front door, she saw Mr. Flores and Raoul bring the victim out of his bedroom. The victim was naked; his mouth was covered; and

his hands were bound. She stated that both Mr. Flores and Raoul had handkerchiefs covering their faces, that Ms. Newell wore a white ski mask, and that Mr. Chapman wore a black ski mask. Ms. Faulkner grabbed a small tote and returned to the van. Ms. Newell and Mr. Chapman each placed an item in the back of the van and got into the van. Either Mr. Flores or Raoul placed a garbage can containing what appeared to be an "army gun" in the back of the van; they both got into the van; and Mr. Flores drove the van away from the scene.

Ms. Faulkner testified that they were supposed to return to the hotel. While they were driving down the interstate, Mr. Chapman commented about a vehicle behind them. Ms. Faulkner looked back but did not see a police car. Those sitting in the back of the van ducked down, and Ms. Faulkner scooted down in her seat. The car followed them off the interstate, and those in the van began to "panic." Once they were in Nashville, a police officer behind them activated his emergency lights. The van did not stop, and Ms. Faulkner testified that Mr. Chapman gave Mr. Flores directions. Once they arrived at an apartment complex, Mr. Chapman told Ms. Newell to prepare to jump and that she needed to run fast. Mr. Chapman, Ms. Newell, Mr. Flores, and Raoul jumped out of the van, and the van crashed. Ms. Faulkner got out of the van and started to run, but a police officer ordered her to get on the ground and arrested her.

On cross-examination, Ms. Faulkner acknowledged that she had prior theft and drug convictions. She stated that while incarcerated, her children were living elsewhere and that she wanted to regain custody, but she denied that she was lying in order to regain custody of her children. She denied that she had been promised a deal in exchange for testifying and explained, "I mean I hope, but it's not guaranteed. I'm just doing the right thing like I've done since the first day." She denied having a deal with the State that provided for her release in "September" or that the State planned to offer her one year of probation after she testified. She explained that she told her boyfriend this during a telephone conversation while incarcerated in order "to give him hope." She acknowledged that she and her boyfriend discussed living together in an apartment.

Ms. Faulkner agreed that during a meeting with the prosecutor, she stated that she planned to purchase shoes with the money that she was to receive from the home invasion. She admitted that she told her mother during a telephone conversation while incarcerated that all she had to do was knock on the door and she would be paid $5,000. Ms. Faulkner stated that she lied to her mother when she told her mother that she only stepped inside the house and then returned to the van.

Ms. Faulkner stated that she did not hear the name of Ms. Pittman until Ms. Faulkner was incarcerated and that she did not know whether Mr. Morales knew the victim. Ms. Faulkner stated that she was unsure whether both Mr. Flores and Raoul were

wearing facial coverings while inside the victim's house and later testified that both men were wearing facial coverings at one point.

Detective Tamara Pittz with the Franklin Police Department testified that one of her duties as a member of the Criminal Investigations Division in the Special Victim's Unit was to conduct forensic examinations of computers and cell phones. The trial court accepted Detective Pittz as an expert in her field. Detective Pittz utilized a platform or program to extract information from a cell phone linked to Mr. Morales, a cell phone recovered from the van linked to "Christian Colmenares," and a cell phone linked to Mr. Chapman. The extraction reports showed one call between Mr. Morales's cell phone and Christian Colmenares's cell phone on the day of the offenses. The reports also showed calls between Mr. Morales's cell phone and Mr. Chapman's cell phone at 7:27 a.m., 7:42 a.m., 9:20 a.m., 9:29 a.m., 9:54 a.m., and 10:19 a.m. on the day of the offenses. Mr. Morales's cell phone included a Facebook message sent to Ms. Pittman two days after the offenses stating, "ey hit me up asap ma wat happend u stil on My side o da world y u leav ur fone at da hotel." On cross-examination, Detective Pittz testified that according to the report of Mr. Morales's cell phone, Ms. Pittman used Mr. Morales's cell phone to access her Facebook account and exchanged messages with someone else.

**The Defendants' Proof at Trial**

Ms. Newell chose to testify in her own defense. She stated that Mr. Chapman dated her younger sister and that he and her younger sister often drove her to work because she did not own a vehicle. On the day prior to the offenses, Ms. Newell was suspended from work for five days for using her social media account while at work. She stated that once she left work, she took Xanax, smoked marijuana, and drank liquor. She went to a club with some friends where she took more Xanax and continued to drink alcohol. She woke up the following day in the apartment of someone whom she did not know. She called either her sister or Mr. Chapman, and Mr. Chapman came to the apartment.

Ms. Newell testified that when she got into a car with Mr. Chapman, she took Xanax and smoked marijuana. They then went to the hotel, but Ms. Newell denied ever going into the room. She saw Ms. Faulkner and two Hispanic men exit the room. Ms. Newell maintained that she got into the van believing that she was going to be taken home. She sat in the back seat, and Mr. Chapman and one of the other men sat in front of her. Ms. Newell testified that she nodded off once she got into the van. She recalled the man sitting next to Mr. Chapman producing a gun once the van pulled into the victim's driveway. Mr. Chapman and the other two men entered the home, while Ms. Faulkner remained in the front seat. Ms. Newell said that she nodded off again and that when she awoke, she saw the man with the gun loading items into the van while Ms. Faulkner

- 12 -

stood at the door as if she was holding it open. Ms. Faulkner then got back into the van. Ms. Newell called Mr. Chapman and asked him what was happening. He told her to remain calm and that he was about to exit the house. Mr. Chapman returned to the van with a black case; the other men got into the van; and they left. Ms. Newell maintained that she never got out of the van.

Ms. Newell testified that as they were traveling down the interstate, she dropped her cell phone and began digging through items on the floor in an effort to find it. She stated that while searching for her cell phone, she placed her hand on a case beside her and that Mr. Chapman threw a white mask at her and told her to wipe her handprints off the case. Ms. Newell said she did not recall what she did with the mask. She acknowledged that when she was arrested, the officers removed her cell phone, the white mask, and gloves from her pocket. She stated that the gloves were tucked inside the mask when Mr. Chapman gave the mask to her.

Mr. Chapman noticed someone was behind them and told the driver. Ms. Newell testified that they "went on a chase." She stated that once the driver and the other Hispanic man jumped out of the van, the van was going to wreck, so she took her "chances on jumping out." She said that she fell on the ground and that the van ran over her foot. She maintained that she was not thinking and just ran and that she stopped as soon as she encountered a police officer.

On cross-examination, Ms. Newell acknowledged that she had a prior theft conviction. She agreed that she was on drugs at the time of the offenses and that some of the details were "fuzzy." She testified that Mr. Chapman was with another man when he came to the apartment on the morning of the offenses and that the man dropped her and Mr. Chapman off at the hotel and left. She stated that she did not know Mr. Morales and never saw him until she was in court following her arrest. She identified Mr. Flores as the driver of the van and said she never saw him with a gun. She stated that Raoul was the man who had the gun. She also stated that she only saw Raoul and Mr. Chapman bring items from the house to the van. She did not see anyone wearing facial coverings or Mr. Chapman wearing a black mask while in the van.

Mr. Flores also chose to testify in his own defense through an interpreter. He stated that he worked in the Nashville area painting and remodeling homes and that he borrowed the white van from a friend. On the day before the offenses, Mr. Morales, who was Mr. Flores's former supervisor, called him about a job removing flooring from a home on the following day. Mr. Flores also spoke to Raoul, a co-worker, who wanted to borrow the van from Mr. Flores. Mr. Flores told Raoul that the van did not belong to him but offered to drive him where he needed to go. Raoul gave him directions to the hotel where he was staying. On the following day, Mr. Flores went to the hotel room. He said

that Raoul came to the door and was "half-naked" and that Ms. Faulkner was inside the room and also "half-naked." Mr. Flores waited outside while Ms. Faulkner got dressed, and he entered the room.

Mr. Flores testified that a Hispanic man, Raoul's friend, arrived, spoke to Raoul, and left in a red car. Mr. Flores stated that he did not listen to their conversation and maintained that no one told him about the robbery. Mr. Flores, along with Ms. Faulkner, Ms. Newell, Raoul, and Mr. Chapman got into the van. Raoul instructed Mr. Flores to drive to Walmart. When they arrived, Raoul was talking on his cell phone, so he gave Mr. Flores $20.00 and instructed him to accompany Ms. Faulkner into Walmart and pay for her items. Mr. Flores said he did as he was instructed. Raoul then told Mr. Flores to drive to a convenience store to purchase gasoline. Mr. Flores stated that he asked Raoul where they were going and that Raoul told him that they were going to move some items out of a friend's house in Franklin.

Mr. Flores testified that Raoul gave him directions to the house. Mr. Flores stated that at one point, someone called his cell phone and asked for Raoul. Mr. Flores gave his cell phone to Raoul, who spoke to the person and kept Mr. Flores's cell phone after the call ended. Mr. Flores said that when they arrived at the house, the red car that the Hispanic man drove from the hotel was parked on the street. Mr. Flores parked the van facing forward in the driveway. Raoul asked for the keys to the van and backed the van onto the grass and in front of the door while everyone else stood outside. Mr. Flores stated that Raoul asked him to knock on the door, but Mr. Flores did not feel comfortable doing so and returned to the van. He saw Raoul speak to the others and then go to the door with Ms. Faulkner and the Hispanic man who was in the red car. When no one opened the front door, they returned to the driveway. Ms. Faulkner returned to the van but then left again once she received a call. Mr. Flores stated that while he and Ms. Faulkner were in the van, Raoul, Mr. Chapman, and the Hispanic man walked toward the right side of the garage and disappeared for six or seven minutes. Raoul opened the front door, and Mr. Flores heard shouts in Spanish. Mr. Flores and Ms. Faulkner exited the van, and Ms. Faulkner entered the house. Raoul instructed Mr. Flores to take a heavy black bag to the van, and Mr. Flores did so. Mr. Flores maintained that he did not believe that they were stealing these items because Raoul had told him that they were going to move items from the home.

Mr. Flores stated that he reentered the van and did not pay attention to what was occurring, even though he knew that the others were removing items from the house. The Hispanic man returned to his car, and the others returned to the van. Raoul loaded a black garbage can into the van, gave the keys to the van to Mr. Flores, and instructed him to drive to Nashville. While traveling on the interstate, Raoul gave a black bag to Mr. Flores and instructed him to hold it. Raoul began changing his clothes and instructed Mr.

Flores to drive to a friend's house where Raoul planned to leave the items. Mr. Flores testified that as they were nearing their exit from the interstate, Raoul instructed him in Spanish to drive slowly to the exit because he believed police officers were following them. Mr. Flores stated that he started to pull over but that Raoul had a gun and threatened to shoot him if he stopped. Once they arrived at the apartment complex, Raoul told Mr. Flores that he needed to jump out of the van because the officers were going to catch them. Mr. Flores was apprehended and testified that he did not learn that a robbery occurred until a few days later.

On cross-examination, Mr. Flores testified that he has been referred to as "Christian." He denied seeing Mr. Morales at the hotel. Mr. Flores stated that Ms. Newell was sleeping in the van on the way to the victim's house. He also stated that he only placed two bags into the van and that he did not see any televisions in the van. He maintained that he ran from the police officers because he was not in the country legally. When questioned about the officers' finding the victim's checks in his possession, Mr. Flores stated that Raoul gave them to him and instructed him to give them to another person later.

The Defendants were each charged with especially aggravated kidnapping, aggravated robbery, aggravated burglary, aggravated burglary while acting in concert with two or more persons, theft of property valued at $1,000 or more, and conspiracy to commit aggravated robbery. Mr. Flores also was charged with possession of a firearm during the commission of a dangerous felony and employment of a firearm during the commission of a dangerous felony with aggravated burglary as the dangerous felony in both charges. The jury acquitted the Defendants of the charge of especially aggravated kidnapping but convicted them of aggravated robbery, two counts of aggravated burglary, theft of property valued at $1,000 or more, and conspiracy to commit aggravated robbery. The jury also convicted Mr. Flores of possession of a firearm during the commission of a dangerous felony and employment of a firearm during the commission of a dangerous felony. The trial court merged the theft conviction into the aggravated robbery conviction, the two aggravated burglary convictions, and Mr. Flores's firearm convictions.

Following a sentencing hearing, the trial court sentenced Mr. Flores as a Range I, standard offender to ten years for the aggravated robbery conviction, ten years for the aggravated burglary conviction, four years for the conspiracy conviction, and six years for the conviction of employment of a firearm during the commission of a dangerous felony. The trial court ordered Mr. Flores to serve his sentences consecutively for an effective thirty-year sentence. The trial court found that Mr. Morales was a Range II, multiple offender with a prior aggravated robbery conviction and imposed consecutive sentences of twenty years for the aggravated robbery and aggravated burglary convictions

and eight years for the conspiracy conviction, for an effective sentence of forty-eight years. The trial court sentenced Ms. Newell as a Range I, standard offender to ten years for each of the aggravated robbery and aggravated burglary convictions and four years for the conspiracy conviction. The trial court ordered Ms. Flores to serve the sentences consecutively for an effective sentence of twenty-four years.

The Defendants each filed a motion for new trial, which the trial court denied. This appeal followed.

## ANALYSIS

### I. Sufficiency

Mr. Flores and Ms. Newell challenge the sufficiency of the evidence supporting their convictions. Mr. Flores contends that he was unaware that a robbery was going to or had occurred, that he believed he and his co-defendants were invited to enter the house, and that he believed they had the victim's consent to remove the items from the house. Ms. Newell contends that Ms. Faulkner's testimony as an accomplice was not sufficiently corroborated and that the evidence is insufficient to establish her participation in the offenses. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn.

2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As alleged in the indictment, aggravated robbery is robbery that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). At the time of the offense and when the Defendants were sentenced, theft of property valued at $1,000 or more but less than $10,000 was a Class D felony. T.C.A. § 39-14-105(a) (2014).[1]

With regard to the conviction of conspiracy to commit aggravated robbery, conspiracy is committed when

> two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

T.C.A. § 39-12-103(a). "No person may be convicted of conspiracy to commit an offense, unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d). "While the essence of the offense of conspiracy is an agreement to accomplish a criminal or unlawful act, … the agreement need not be formal or expressed, and it may be proven by circumstantial evidence." *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998) (internal citations omitted).

As charged in the indictment, aggravated burglary occurs when a defendant enters into a habitation without the effective consent of the owner and with the intent to commit theft, and the offense is a Class C felony. T.C.A. § 39-14-402(a)(1), -403(a). Aggravated burglary "committed while acting in concert with two (2) or more other persons" is a Class B felony. T.C.A. §§ 39-12-302(a), -301(2)(C). With regard to Mr. Flores's firearm charges, "[i]t is an offense to possess a firearm with the intent to go armed during the

---

[1] Effective January 1, 2017, the theft grading statute, Tennessee Code Annotated section 39-14-105, was amended to provide for lesser penalties in some instances based upon the value of the property taken. However, because the Defendants were sentenced prior to the effective date of the amendment, the prior version of the statute controls. *See State v. Keese*, 591 S.W.3d 75, 83-84 (Tenn. 2019).

commission of or attempt to commit a dangerous felony." T.C.A. § 39-17-1324(a) (2014). It is also an offense "to employ a firearm during the … [c]omission of a dangerous felony." T.C.A. § 39-17-1324(b)(1) (2014). Aggravated burglary constitutes a dangerous felony. T.C.A. § 39-17-1324(i)(1)(H) (2014).

The trial court instructed the jury on criminal responsibility for the conduct of another with regard to all of the charges other than Mr. Flores's firearm charges. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). A defendant can be held criminally responsible for the conduct of another if "[a]cting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2). The evidence at trial "must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

## A. Corroboration of Accomplice Testimony

Ms. Newell maintains that the evidence is insufficient to corroborate Ms. Faulkner's testimony as an accomplice in implicating Ms. Newell in the offenses. A criminal defendant in Tennessee cannot be convicted "solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (citing *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994), *superseded by statute as stated in State v. Odom*, 137 S.W.3d 572, 583 (Tenn. 2004); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886, 899 (Tenn. 2013)). "An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). The test of whether a witness qualifies as an accomplice is "whether the alleged accomplice could be indicted for the same offense charged against the defendant." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Ms. Faulkner was indicted for the same offenses charged against the Defendants and, therefore, qualified as an accomplice.

Our supreme court has stated that in order to properly corroborate accomplice testimony,

"[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence."

*Shaw*, 37 S.W.3d at 903 (quoting *Bigbee*, 885 S.W.2d at 803). The corroborating evidence need only be "slight." *State v. Griffs*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Whether sufficient corroboration exists is for the jury to determine. *Shaw*, 37 S.W.3d at 903; *Anderson*, 985 S.W.2d at 16.

In the present case, the victim's testimony established that "a crime has been committed" independent of Ms. Faulkner's testimony. Furthermore, the evidence corroborates Ms. Faulkner's testimony implicating Ms. Newell in the commission of the crimes. Ms. Newell's testimony admitting that she was in the van while traveling and fleeing from the victim's home corroborates Ms. Faulkner's testimony regarding Ms. Newell's presence at the scene. Ms. Faulkner testified that Ms. Newell wore a white ski mask; Ms. Newell was in possession of a white ski mask when she was apprehended; and the victim testified to seeing a person wearing a white mask while inside his home. Ms. Faulkner testified that Mr. Morales gave each participant a pair of gloves, and Ms. Newell had gloves as described by Ms. Faulkner in her possession when officers apprehended her. Ms. Faulkner testified that she and Ms. Newell removed three televisions from the home and loaded them into the van, and the victim confirmed her testimony regarding the three televisions and the rooms from which each television was taken. These televisions were later recovered from the van from which Ms. Newell and the other participants fled. We conclude that the evidence was sufficient to corroborate Ms. Faulkner's testimony as an accomplice.

### B. Elements of the Offenses

Mr. Flores and Ms. Newell maintain that the evidence is insufficient to establish that they committed the offense of which they were found guilty. The evidence, when viewed in the light most favorable to the State, established that Mr. Morales devised a plan to conduct a home invasion of the victim's house and steal his belongings, and he enlisted Mr. Flores, Ms. Newell, Ms. Faulkner, Mr. Chapman, and Raoul to carry out the plan. According to Mr. Morales's plan, Ms. Faulkner was to knock on the victim's door

- 19 -

while dressed as a "professional" so that the victim would open the door and the other participants could force their way inside the home. On the day before the offenses, Mr. Morales drove Ms. Faulkner to Walmart and purchased high-heeled shoes and a scarf for her.

On the morning of the offenses, the participants met at a hotel room that Mr. Morales had rented to discuss the home invasion. Mr. Morales told them the items which would be in the home, gave each participant gloves to use, provided directions to the victim's home to Mr. Flores, and gave Mr. Flores and Raoul each a gun. Mr. Flores drove the van to the victim's home. While en route, they stopped at Walmart where Mr. Flores purchased a clipboard, a pen, and paper so that Ms. Faulkner would appear more "professional" when she knocked on the victim's door. Ms. Newell and Mr. Chapman converted their hats into masks by creating holes for their eyes.

Once they arrived at the victim's home, Ms. Faulkner knocked on the front door while Mr. Flores stood beside her with a gun. When the victim did not come to the door, Ms. Faulkner and Mr. Flores returned to the van, where Mr. Flores made a call. After the call, Mr. Flores provided an access code to enter the home to Mr. Chapman and a gun to Ms. Newell. Mr. Chapman and Ms. Newell gained entry into the home and opened the front door to allow the others to enter, and Ms. Newell returned the gun to Mr. Flores. Mr. Flores and Raoul entered the victim's bedroom, held him at gunpoint, threatened him, and bound his hands and feet while Mr. Chapman, Ms. Faulkner, and Ms. Newell removed the victim's belongings from his home.

Cell phone records showed multiple phone calls between Mr. Chapman and Mr. Morales around the time of the home invasion. Mr. Chapman was talking on his cell phone when he entered the closet where Mr. Flores and Raoul were holding the victim at gunpoint. Mr. Chapman stated, "Up top," while speaking on his cell phone. He retrieved the victim's rifle from the top shelf of the closet, pointed it at the victim, and demanded to know the location of his safe. Mr. Flores and Raoul forced the victim upstairs at gunpoint. The victim saw Ms. Faulkner standing at the front door, along with a person in a white mask. The evidence established that Ms. Newell was wearing a white ski mask. The victim detailed all of the items taken and their values, which totaled well over $1,000.

Mr. Flores, Raoul, Mr. Chapman, Ms. Newell, and Ms. Faulkner got into the van, and Mr. Flores drove away from the scene. Police officers tried to stop the van, but Mr. Flores refused to stop and drove into Nashville while Mr. Chapman directed him. They drove to an apartment complex where all of the occupants but Ms. Faulkner jumped out of the van and fled from police officers as the van crashed into a pole. When

apprehended by police, Mr. Flores was in possession of the victim's checks, and Ms. Newell was in possession of a white mask and gloves.

The challenges of Mr. Flores and Ms. Newell to the sufficiency of the evidence are based primarily upon their respective testimonies at trial in which they each denied participating in the offenses or having any knowledge that the offenses were to occur. However, in finding Mr. Flores and Ms. Newell guilty of the offenses, the jury rejected their testimony and credited the testimony of the State's witnesses. The jury resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *Bland*, 958 S.W.2d at 659. Although Mr. Flores and Ms. Newell urge this court to re-weigh or reevaluate the evidence, we are prohibited from doing so. *See Matthews*, 805 S.W.2d at 779. Rather, we conclude that the evidence is sufficient to support the convictions.

## II. Denial of the Motions to Suppress

Mr. Flores and Ms. Newell assert that the police officer's initiation of the stop of the van was unconstitutional and that, therefore, the trial court erred in denying their respective motions to suppress. The State responds that the initiation of the stop was supported by probable cause or reasonable suspicion and was constitutional. We agree with the State.

Prior to trial, Mr. Flores filed a motion to suppress, challenging the legality of the traffic stop, his arrest, the search of his van, and his statements to the police. Ms. Newell also filed a motion to suppress, joining in Mr. Flores's motion. A suppression hearing was held shortly before trial during which the State presented Detective Cole and Officer Placentia as witnesses. Their testimony during the hearing was similar to their testimony at trial. Both officers offered testimony during the suppression hearing regarding the information that they received from their respective dispatchers, their observations, the basis for the decision to initiate a traffic stop, the activation of the patrol car's emergency lights, the van's failure to yield, Mr. Flores's jumping from the van while it was still moving, and the van's crashing into a light pole.

Officer Placentia also testified that when he first drove up to the van, he could see some of the occupants "kind of ducking down below the seat and then getting up and moving around." He stated that while he was pursuing the van after he activated his emergency lights, the occupants continued moving around and getting behind their seats as if they were trying to hide something. He testified on cross-examination that when he activated his emergency lights, the van was going the speed limit but that the occupants were moving around the van, ducking down, and getting back up. Officer Placentia

- 21 -

stated on redirect examination, that it did not appear that the occupants in the back of the van were wearing their seatbelts.

At the conclusion of the hearing, the trial court made oral findings and later issued a written order denying the motions to suppress. The trial court found that the officer's activation of the emergency lights on his vehicle constituted a seizure and that the officers had reasonable suspicion to conduct a stop to investigate whether the occupants were involved in the home invasion based upon information that the officers received from the dispatchers and their observations while following the van. The trial court also found that the officers had probable cause or reasonable suspicion to conduct a stop based on the observed seatbelt violations. The trial court found that Mr. Flores and Ms. Newell did not have standing to challenge the search of the van because they abandoned the van and its contents when they jumped out of the van while it was still in motion. The trial court noted that a search warrant was later obtained and that Mr. Flores and Ms. Newell had not challenged the validity of the search warrant.

On appeal, Ms. Newell and Mr. Flores challenge the trial court's finding that the officers had reasonable suspicion to initiate a traffic stop to investigate whether the occupants in the van were involved in the home invasion. In arguing that the initial seizure was unconstitutional, Ms. Newell maintains that "[h]er subsequent seizure and search of her person was also unreasonable given the totality of the circumstances." Mr. Flores asserts that the information regarding the tracking of the iPhone relied upon by Detective Cole was not properly authenticated pursuant to Tennessee Rule of Evidence 901.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions regarding the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* The State, as the prevailing party, is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to its factual findings is a question of law that is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the evidence presented at trial as well as the evidence presented at the suppression hearing. *See State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012); *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures.

*See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the … seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Yeargan*, 958 S.W.2d at 629; *see Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

"Individuals do not lose their constitutional protections against unreasonable searches and seizures by getting into an automobile." *State v. Smith*, 484 S.W.3d 393, 400 (Tenn. 2016). However, a warrant is not required for an investigatory stop "when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *State v. Bridges*, 963 S.W.2d 487, 492 (Tenn. 1997); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Binette*, 33 S.W.3d at 218. Reasonable suspicion is a lower standard of proof than probable cause, but it must be more than the officer's "'inchoate and unparticularized suspicion or "hunch."'" *State v. Hanning*, 296 S.W.3d 44, 49 (Tenn. 2009) (quoting *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008)). Reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." *Binette*, 33 S.W.3d at 218. Reasonable suspicion exists when "specific and articulable facts … taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.

"Whether reasonable suspicion for an investigatory stop exists must be evaluated under the totality of the circumstances known to the police at the time of the stop." *State v. Nicholson*, 188 S.W.3d 649, 659 (Tenn. 2006). In reviewing whether an officer had probable cause or reasonable suspicion to stop a motorist, "the officer's subjective state of mind is irrelevant." *Smith*, 484 S.W.3d at 402. Rather, courts review the validity of a traffic stop "from a purely objective perspective" and "may consider relevant circumstances demonstrated by the proof even if not articulated by the testifying officer as reasons for the stop." *Id.* When opposing a defendant's challenge to the validity of a stop, the State "is not limited … to the grounds ostensibly relied upon by the officer if the proof supports the stop on other grounds." *Id.*

As found by the trial court, the officer's activation of his emergency lights constituted a seizure for constitutional purposes. *See State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993) (holding that generally a seizure results from an officer's activation of emergency lights during an encounter with a citizen). While Mr. Flores and Ms. Newell challenge the trial court's finding that officers had reasonable suspicion to initiate a stop in order to investigate whether the occupants of the van were involved in the home invasion, the trial court found that the officers' observations that the occupants did not appear to have been wearing seatbelts as a separate basis of establishing probable cause

- 23 -

or reasonable suspicion to initiate a stop. On appeal, Mr. Flores and Ms. Newell do not challenge the trial court's separate basis for upholding the seizure. Because the trial court found that the seizure was justified under a theory not challenged on appeal, the Defendants are not entitled to relief regarding this issue.

### III. Denial of the Motions to Continue

The Defendants contend that the trial court erred in denying their motions to continue the trial based upon the State's failure to disclose discoverable evidence in a timely manner. Ms. Newell also contends that the trial court erred in failing to provide a remedy for the State's failure to disclose other discoverable evidence until mid-trial. The State responds that all of the evidence was disclosed in a timely manner and that the trial court did not abuse its discretion in denying the continuance.

### A. Underlying Proceedings

The trial was scheduled to begin on September 28, 2015. On August 11, Ms. Newell's counsel filed a motion to compel the production of the telephone calls of the Defendants and Mr. Chapman from the jail. Counsel stated that her attempt to obtain the calls through a subpoena duces tecum was unsuccessful. On August 18, the trial court entered an order, requiring the prosecutor to provide copies of all of the Defendants' jail calls in the prosecutor's possession to defense counsel by August 26.

On September 22, 2015, both Mr. Flores[2] and Mr. Morales filed motions requesting that the trial court order the prosecution to compel the production of a video-recorded statement of Ms. Faulkner. Counsel stated that on September 18, ten days prior to trial, they received an email from the prosecutor, stating that an agreement had been reached with Ms. Faulkner, that the prosecutor was in possession of a video-recorded statement of Ms. Faulkner, that the prosecutor would not provide a copy of the statement to counsel because it was work product, and that defense counsel could review the video at the prosecutor's office on September 21.

During a pretrial hearing on September 23, defense counsel argued that the State failed to disclose in a timely manner: (1) Ms. Faulkner's statement during a video-recorded interview with the prosecutor; (2) Ms. Faulkner's statement during an interview with the Federal Bureau of Investigation ("FBI"); (3) the recordings of Ms. Faulkner's telephone calls from the jail; (4) a supplemental report from Detective Cole; and (5)

---

[2] Mr. Flores's motion was file-stamped August 22, 2015, but the body of the motion references actions taken in September 2015.

driver's license and vehicle title information. Defense counsel requested the trial court continue the trial due to the late disclosure.

With regard to Ms. Faulkner's recorded interview with the prosecutor, defense counsel stated that on March 2, the trial court set the case for trial, and Ms. Faulkner was to be tried jointly with the Defendants. Defense counsel argued that at that point, the State had a duty to disclose Ms. Faulkner's statement pursuant to Tennessee Rule of Criminal Procedure 16(a)(1)(D) as a statement of a co-defendant whose trial is set jointly with the Defendants. Defense counsel also argued that the statement constituted impeachment material because Ms. Faulkner provided information that was inconsistent with the information that she had provided in other statements and that as a result, the State had a duty to disclose pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). The prosecutor responded that she never decided to try Ms. Faulkner and the Defendants jointly, that Ms. Faulkner's statement constituted "*Jencks*"[3] material which the prosecutor was not required to disclose prior to trial, that the prosecutor did not disclose the statement sooner due to concerns for Ms. Faulkner's safety, and that the prosecutor did not have a duty to disclose the statement pursuant to *Brady* because the statement did not include inconsistent or exculpatory information. The prosecutor acknowledged that the recorded interview with Ms. Faulkner occurred on February 20, 2015, prior to setting the case for trial. The trial court initially ruled that the recorded interview constituted *Brady* material but then stated at the end of the hearing that the court would take the matter under advisement.

Ms. Newell's counsel stated that the day before the hearing, she received from the State a synopsis of the FBI's interview with Ms. Faulkner, and Mr. Morales's counsel stated that he had not yet received it but had reviewed Ms. Newell's copy. Defense counsel argued that some of the information that Ms. Faulkner provided to the FBI was inconsistent with the information that she provided in her recorded interview with the prosecutor. The prosecutor responded that she had to obtain the FBI's permission before providing the summary to defense counsel and that she disclosed the summary upon obtaining such permission. The prosecutor also argued that Ms. Faulkner's statement to the FBI was consistent with her other statements.

Ms. Newell's counsel stated that she also received Detective Cole's supplemental report from the State on the day before the hearing. The prosecutor responded that she recently learned of the existence of the supplemental report while reviewing the file and provided it to defense counsel once she received it from the detective.

---

[3] *See Jencks v. United States*, 353 U.S. 657 (1957).

- 25 -

On September 16, defense counsel received a packet from the prosecutor that included information regarding driver's licenses and titles to vehicles. The prosecutor responded that the State issued a subpoena duces tecum for the certified records and that she provided copies to defense counsel once she received the records from the agencies.

With respect to the recordings of Ms. Faulkner's calls from the jail, Ms. Newell's counsel stated that jail officials inadvertently provided her with the recordings and that Ms. Faulkner made multiple statements that were inconsistent with her statements to law enforcement and the prosecutor. Ms. Newell's counsel acknowledged that she received the recordings in August but stated that she had not had the opportunity to review all of the recordings. Mr. Morales's counsel stated that he received some of the recordings of calls from the jail "a couple of weeks ago" and that on "Friday," he discovered that he was unable to listen to one of the compact discs. The prosecutor responded that once she learned of the issues with the compact disk, she contacted jail officials and asked them to provide additional copies to defense counsel. Both counsel for Mr. Morales and Mr. Flores stated that they did not yet have the recordings of Ms. Faulkner's calls. However, neither claim on appeal that they did not receive the recordings prior to trial.

The trial court entered a written order denying the Defendants' motion to continue the trial. The trial court found that the video of Ms. Faulkner's interview with the prosecutor, which was one and one-half hours in length, constituted *Jencks* material and was not required to be disclosed by the State pursuant to Rule 16. The trial court also found that even if the recording was *Brady* material, "[t]hat evidence need only be provided in time for the defense to use it at trial." With respect to the recordings of Ms. Faulkner's calls from jail, the trial court found that the recordings were equally available to both parties, that Ms. Newell's counsel had the recordings for several weeks, and that if the recordings constituted *Brady* material, "the State does not have an obligation to provide the recordings pre-trial." The trial court found that the summary of Ms. Faulkner's statement to the FBI, Detective Cole's supplemental report, and the driver's license and vehicle title information had been disclosed to the defense in ample time for the defense to adequately prepare for trial.

## B. *Brady* and Tennessee Rule of Criminal Procedure 16

The Defendants contend that the late-disclosed discovery was subject to disclosure pursuant to *Brady* and Rule 16, that the State failed to disclose the discovery in a timely manner, and that the trial court erred in failing to continue the trial to allow the Defendants the opportunity to review the late-disclosed discovery and conduct further investigation. We conclude that the Defendants failed to establish that the delayed disclosure prevented them from effectively using the discovery at trial and that the trial court did not err in denying the Defendants' request for a continuance.

The suppression of evidence favorable to the accused is a due process violation when the evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87. In order to establish a violation based on the withholding of favorable evidence, the defendant must demonstrate that: (1) the defendant requested the evidence or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the evidence that was suppressed was favorable to the accused; and (4) the evidence meets the standard of materiality. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). The defendant has the burden of proving a violation by a preponderance of the evidence. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995), *as amended on rehearing* (Tenn. July 10, 1995).

The State's *Brady* obligations reach all "favorable information," regardless of its admissibility. *Jordan v. State*, 343 S.W.3d 84, 96 (Tenn. Crim. App. 2011) (quoting *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001)). "Information that is favorable to the accused may consist of evidence that 'could exonerate the accused, corroborate[] the accused's position in asserting his innocence, or [contain] favorable information that would have enabled defense counsel to conduct further and possibly fruitful investigation regarding'" a potential defense. *Johnson*, 38 S.W.3d at 56 (quoting *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992)). Evidence which permits the defense to impugn the reliability of the State's investigation, impeach the credibility of witnesses, or bolster the defense's position amounts to favorable evidence. *Jordan*, 343 S.W.3d at 96.

Nevertheless, there is no suppression when the material is disclosed in time for a defendant to use it effectively at trial. *See United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (finding no *Brady* violation where the material was disclosed at trial and the defendant refused an opportunity to postpone the trial); Wayne R. LaFave et al., 6 Crim. Proc. § 24.3(b) n.88 (4th ed. 2017). "Although the complete non-disclosure of significant exculpatory evidence often makes an easy case for a due process violation, delayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting). Because a violation occurs only when the suppression of material exculpatory evidence prevents its effective use at trial, "'*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose.'" *State v. Justin Terrell Knox*, No. W2014-01577-CCA-R3-CD, 2015 WL 6122257, at *4 (Tenn. Crim. App. Oct. 16, 2015) (quoting *Davis*, 306 F.3d at 421). Delayed disclosure constitutes a due process violation only when the delay causes prejudice to the defendant. *Id.*

In the event of a violation of the discovery provisions of Tennessee Rule of Criminal Procedure 16, the trial court may order discovery or inspection, grant a continuance, exclude the evidence, or take other remedial measures. Tenn. R. Crim. P.

16(d)(2). Accordingly, the trial court should fashion relief which is effective and appropriate. *State v. Collins*, 35 S.W.3d 582, 585 (Tenn. Crim. App. 2000). Any prejudice accruing to the accused is a factor in determining what remedy is appropriate. *State v. Giles*, 493 S.W.3d 504, 521 (Tenn. Crim. App. 2016). "A trial court has wide discretion in fashioning a remedy for non-compliance with a discovery order, and the sanction should fit the circumstances of the case." *State v. Downey*, 259 S.W.3d 723, 737 (Tenn. 2008). An abuse of discretion occurs when the trial court applies an incorrect legal standard or when it reaches a decision which is against logic or reasoning and which causes an injustice to the party complaining. *State v. Merriman*, 410 S.W.3d 779, 791 (Tenn. 2013).

Many of the arguments in the briefs of the Defendants and the State center on whether the material was subject to disclosure pursuant to *Brady* or Tennessee Rule of Criminal Procedure 16. We note that the Defendants do not claim that the State failed to disclose the material prior to trial but maintain that the State failed to disclose the evidence in sufficient time to allow the Defendants to effectively investigate and utilize the evidence at trial. However, the record reflects that defense counsel thoroughly questioned Ms. Faulkner on cross-examination regarding her prior statements about her role and the Defendants' roles in the offenses and her telephone conversations from jail during which she discussed her role and the benefits she expected to receive from the State in exchange for her cooperation. Detective Cole's supplemental report related to the stop, which the Defendants thoroughly challenged and litigated during the suppression hearing and at trial. The driver's license and vehicle title information did not involve hotly contested issues at trial. Regardless of whether the material was subject to disclosure pursuant to *Brady* or Tennessee Rule of Criminal Procedure 16, the Defendants have failed to establish that the delay in the disclosure prevented them from effectively using the material effectively in preparing and presenting their defense. Accordingly, the trial court did not abuse its discretion in holding the trial as scheduled.

Ms. Newell also maintains that the trial court erred in failing to impose an appropriate remedy for the State's failure to disclose "dispatch/radio traffic, and/or CAD reports from both the Brentwood Police Department and Williamson County Sheriff's Office" until the middle of trial. Ms. Newell maintains that this evidence established that the description of the suspects dispatched to the officers did not include a person matching her description and would have corroborated her testimony at trial that she never entered the home. We note that when Ms. Newell's counsel requested the material at trial, the trial court ordered the State to produce the material and reprimanded the prosecutors for failing to provide it sooner. Ms. Newell never requested a mistrial or any other remedy due to the late disclosure. Furthermore, it was established at trial that the victim did not identify a woman matching Ms. Newell's description when he called 911, and the information provided to the officers by the dispatchers did not include a woman

matching Ms. Newell's description. Ms. Newell has failed to establish that the State's late disclosure of the material resulted in prejudice.

## IV. Admission of Expert Testimony

Mr. Flores maintains that the trial court erred in accepting Detective Pittz as an expert in the field of computer and cell phone extractions and in admitting her testimony regarding information extracted from various cell phones connected to the case. Mr. Flores argues that Detective Pittz was not qualified to testify as an expert, that the process or system about which she testified was not properly authenticated pursuant to Tennessee Rule of Evidence 901, and that her testimony was not reliable. The State responds that the trial court properly exercised its discretion in admitting the evidence. We agree with the State.

Once the State began questioning Detective Pittz at trial regarding her examination of the cell phones, both counsel for Mr. Morales and counsel for Mr. Flores objected. Counsel for Mr. Flores argued that the State had failed to establish that Detective Pittz was qualified as an expert, that her opinions were reliable, and that the data extracted from the cell phones was properly authenticated. The prosecutor responded that Detective Pittz could offer such testimony as a lay witness but that, nevertheless, he could properly qualify her as an expert.

During a jury-out hearing, Detective Pittz testified that she had completed over 160 hours of training on cell phone forensics and over 400 hours of training on computers and computer-related forensics. She had received training on the various platforms used to extract information from cell phones. She previously had conducted forensic examinations on approximately forty-five cell phones and ten computers. She had testified regarding cell phone extractions on two prior occasions but had never testified as an expert.

On cross-examination, Detective Pittz testified that her training on the types of computer language was "[v]ery minimal." She completed a five-week course provided by the Secret Service during which she received training on the collection process, the extraction process, and the analysis of the data. She explained that a cell phone extraction involves a computer program reading the cell phone and pulling the data from it. The type of data that is read is dependent upon the platform used. She did not know how the computer software program read the data and stated that programmers did not disclose such proprietary information to the public.

Detective Pittz testified that the company that developed the software to conduct the extractions had undergone a validation process. She noted that the software had been

tested by a national institute for validation purposes and that the examiner also had validation techniques available. She explained that once an examiner extracts the information from the cell phone through a platform, the examiner may compare the information found in the reports to the actual information in the cell phone to ensure that they are consistent. She stated that thousands of pages of information were extracted from each cell phone in this case and that she did not compare all of the data listed in the reports with the information stored in the cell phone. She compared some of the text messages, some of the telephone numbers, and some of the contacts, but she was unable to estimate the amount of information that she compared. Detective Pittz stated that some of the information was written in a computer language and included in the reports as logs, but she did not validate the logs. She also stated that the system used by the Franklin Police Department likely had not been tested by the national institute. She did not test the email addresses extracted from the cell phones to determine whether the email addresses were legitimate, and she did not test or call the cell phone numbers from the call logs extracted from the cell phones to determine whether they were valid. She did not contact the cell phone providers to determine whether the cell phone numbers from the call logs were listed under names other than those identified in the cell phones.

The trial court found that Detective Pittz had "specialized, technical or scientific knowledge that would qualify her under [Tennessee Rules of Evidence] 702 and 703 and 704" and that defense counsel could explore any arguments challenging the detective's qualifications on cross-examination. Mr. Flores's counsel argued that the State had failed to establish that the process or system has been authenticated and, thus, reliable pursuant to Tennessee Rule of Evidence 901(b)(9). The trial court found that Detective Pittz satisfied Rule 901 by comparing the data in the reports to data in the cell phone to ensure that the data matched. Counsel noted that he was challenging the reliability of Detective Pittz's opinion under Rule 703 but continued to argue that the system or process had not been properly authenticated pursuant to Rule 901. The trial court found that "the State has made a sufficient showing, to comply with Rule 901, the authentication, as well as Rules … 702, 703, and 704 to qualify her as an expert, or someone with specialized knowledge or training."

On appeal, Mr. Flores asserts that the trial court erred in determining that Detective Pittz was qualified to testify as an expert regarding cell phone extractions. The trial court has broad discretion in determining the qualifications, admissibility, relevancy, and competency of expert testimony. *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002). This court will not overturn the trial court's ruling on the admissibility of expert testimony absent an abuse of that discretion. *See State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). "'A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous

assessment of the evidence.'" *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

Tennessee Rule of Evidence 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." An expert "may acquire the necessary expertise through formal education or life experiences." *State v. Reid*, 91 S.W.3d 247, 302 (Tenn. 2002). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." *Id.*

Detective Pittz testified regarding the hundreds of hours of training that she had received on computer and cell phone extractions, as well as her experience in conducting such extractions. The trial court determined that Detective Pittz was qualified to testify as an expert in cell phone extractions and allowed her to testify regarding the data that she extracted from the cell phones of various defendants and co-defendants. Although Mr. Flores argues that Detective Pittz had never previously testified as an expert and was unfamiliar with the proprietary technology of the computer codes utilized by the platforms to extract the data, the trial court found that such arguments could be explored by Mr. Flores's counsel on cross-examination. We conclude that the trial court did not abuse its discretion in this regard.

Mr. Flores next asserts that the process or system used in extracting data from the cell phones was not properly authenticated in accordance with Tennessee Rule of Evidence 901(b)(9) in that there was not showing that the process or system produced an accurate result. "The requirement of authentication or identification as a condition to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Both Rule 901 and the common law designate the trial court as the "arbiter of authentication issues," and, thus, the trial court's ruling will not be disturbed on appeal absent a showing that the trial court clearly abused its discretion. *See* Tenn. R. Evid. 901, Advisory Comm'n Comments; *State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003).

Rule 901(b) lists examples of authentication or identification that conform with the requirements of the rule and proves that such examples are "[b]y way of illustration only, and not be way of limitation." Rule 901(b)(9) includes the means of authenticating a process or system as "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." Detective

Pittz testified that the company that developed the software or platform underwent an evaluation process. She also validated the results of the extractions of the cell phones by comparing the text messages, the telephone numbers, and the contacts listed in the reports to the contents of the cell phones to ensure that the information appeared in the cell phones. Mr. Flores argues that "[t]he fact that counsel received in discovery 5,000-6,000 pages of cell phone data in the report to what was allegedly on the phone and that [Detective Pittz] did not verify every item[] and couldn't even recall if she verified just the day in question goes to unreliability of these systems." However, Detective Pittz was not required to verify each and every item in the report to establish the authenticity of the evidence. Rather, according to the Advisory Commission Comments to Rule 901(b)(9), "[a]ll that the lawyer need do is introduce evidence satisfying the court that the computer system produces accurate information." The trial court determined that Detective Pittz's comparison and verification of a sample of the data listed in the extraction report was sufficient to authenticate the system or process used in cell phone extractions, and we cannot conclude that the trial court abused its discretion in this regard.

Finally, Mr. Flores challenges the reliability of Detective Pittz's testimony based upon Tennessee Rule of Evidence 703, which requires that the trial court "disallow [expert] testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." He maintains that the testimony did meet the factors used in evaluating the reliability of expert testimony. In *McDaniel v. CSX Transportation, Inc.*, our supreme court listed "nonexclusive factors" that courts "could" consider in evaluating the reliability of scientific testimony, including:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether … the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

955 S.W.2d 257, 265 (Tenn. 1997). These factors also may be applied to nonscientific expert testimony. *See State v. Stevens*, 78 S.W.3d 817, 834-35 (Tenn. 2002). Other nondefinitive factors that a trial court may consider in assessing the reliability of an expert's methodology include the expert's qualifications and the connection between the expert's knowledge and the basis of the expert's opinion. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 274-75 (Tenn. 2005); *Stevens*, 78 S.W.3d at 835. At trial, Mr. Flores did not specifically challenge the reliability of Detective Pittz's testimony based upon the application of these factors. Nevertheless, any error in the admission of the evidence is harmless in light of the overwhelming evidence supporting Mr. Flores's guilt. *See* Tenn. R. App. P. 36(a). Mr. Flores is not entitled to relief regarding this issue.

# V. Denial of Motion for Mistrial

Mr. Morales maintains that the trial court erred in denying his motion for mistrial when counsel for Ms. Newell questioned Ms. Faulkner about Mr. Morales's illegal drug activity in violation of the trial court's order granting Mr. Morales's motion in limine. The State responds that the trial court properly exercised its discretion in declining to declare a mistrial. We agree with the State.

Prior to trial, Mr. Morales filed a motion in limine seeking to exclude any testimony that he engaged in illegal drug activity. During a pretrial hearing, the State agreed not to present such evidence, and the trial court granted the motion. While questioning Ms. Faulkner on cross-examination at trial, Ms. Newell's counsel mentioned Ms. Faulkner's "financial struggles" and asked her, "It was very tempting when [Mr. Morales] had contacted you and asked you if you would sell drugs for them?" Mr. Morales's counsel objected and moved for a mistrial. The trial court denied the motion, noting "it was so quick and it was just one comment. I don't know that she even answered." The trial court offered to provide a curative instruction to the jury, but Mr. Morales's counsel declined, stating the instruction would only draw attention to the improper question.

"The purpose of declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). A mistrial should be declared only upon a showing of manifest necessity, that is, when a miscarriage of justice would result if the trial were to continue. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). The appellant bears the burden of establishing manifest necessity. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). In evaluating whether the trial court abused its discretion, the appellate court may consider: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." *Welcome*, 280 S.W.3d at 222. The decision to grant a mistrial lies within the sound discretion of the trial court. *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003).

While the question from Ms. Newell's counsel was clearly improper, Mr. Morales's counsel promptly objected prior to any answer. As a result, no improper evidence was admitted. The question came toward the end of the State's proof after multiple days of trial. The trial court did not abuse its discretion in determining that the question was not so prejudicial that manifest necessity required a mistrial. Furthermore, the trial court later instructed the jury that "[s]tatements, arguments, and remarks of counsel … are not evidence." "The jury is presumed to follow its instructions." *State v.*

*Young*, 196 S.W.3d 85, 111 (Tenn. 2006). Mr. Morales is not entitled to relief regarding this issue.

## VI. Failure to Issue an Accomplice Instruction

Mr. Morales and Ms. Newell contend that the trial court erred in failing to instruct the jury of the requirements that the testimony of an accomplice must be sufficiently corroborated. Neither defendant, however, requested this instruction at trial. "In contrast to an erroneous instruction or the failure to give a requested instruction," any "alleged omissions in the jury charge must be called to the trial judge's attention or be regarded as waived." *State v. Robinson*, 146 S.W.3d 469, 509 (Tenn. 2004). Because neither of these defendants requested a jury instruction on the corroboration of an accomplice's testimony at trial, this issue is waived. *See State v. Bowman*, 327 S.W.3d 69, 94 (Tenn. Crim. App. 2009); *State v. Anderson*, 985 S.W.2d 9, 17-18 (Tenn. Crim. App. 1997). Neither of the defendants requested that this court review the issue for plain error. Although this court may, in certain circumstances, address as plain error an issue that would otherwise be waived, we decline to engage in a plain error review of this issue. *See* Tenn. R. App. 13(b). Mr. Morales and Ms. Newell are not entitled to relief regarding this issue.

## VII. Sentencing

Mr. Morales and Ms. Newell challenge the trial court's imposition of consecutive sentences. The State responds that the trial court properly exercised its discretion in ordering consecutive sentences. We agree with the State.

### A. Sentencing Hearing

The State entered the presentence reports of Mr. Morales and Ms. Newell as exhibits during the sentencing hearing. Mr. Morales's presentence report reflected that he had prior convictions for attempted aggravated robbery and aggravated robbery. He was released on parole when he committed the instant offenses. As part of the presentence report, Mr. Morales also submitted a handwritten statement in which he admitted that he was selling marijuana for Raoul prior to the offenses. He denied participating in the commission of the offenses. He stated that while he was watching the police chase on television, he received a text message from Raoul, who said the police were after him and asked Mr. Morales to pick him up. Mr. Morales stated that he drove Raoul to the hotel room to retrieve Raoul's belongings and his marijuana and then drove him to a home in Lebanon, Tennessee.

- 34 -

According to Ms. Newell's presentence report, at the time of the instant offenses, she had five prior convictions of drug possession and a prior conviction for driving on a suspended license. Her probation had been revoked on multiple occasions. At the time she committed the instant offenses, she was charged with theft of property valued less than $500 and possession or casual exchange of drugs, and she was subsequently convicted of the charges. The State presented documentation establishing that Ms. Newell was released on bond at the time of the instant offenses. The presentence report reflects that Ms. Newell admitted frequent use of Xanax and marijuana.

Mr. Morales presented the testimony of his mother, who explained their family's moving to Nashville when Mr. Morales was sixteen years old, their financial struggles, and the impact of the death of a cousin with whom Mr. Morales had a close relationship. She stated that Mr. Morales became quiet and reserved, was angry, and began reacting harshly toward his family. She stated that Mr. Morales was incarcerated at the age of seventeen and remained in prison for four years. After he was released on parole, he lived with his parents and worked in the construction industry. His mother acknowledged that he was released on parole four or five months before he was arrested for the instant offenses.

Mr. Morales stated by allocution that when he was released from prison, he was unable to find employment so he started a construction business. He stated that he completed a class on social life skills while incarcerated and requested that the trial court order him to take additional classes while in prison.

Ms. Newell presented the testimony of her mother and her father and a letter from her grandmother. Her mother and father testified regarding the help that Ms. Newell provided in caring for her siblings when she was younger. Her mother testified that Ms. Newell "got off-track" after her grandfather's death. Her mother maintained that the offenses were not part of Ms. Newell's nature and that she would not commit similar offenses in the future. Ms. Newell's mother testified that she was unaware of Ms. Newell's substance abuse problems and that Ms. Newell never used drugs in her presence. Her mother said she would not be surprised if Ms. Newell admitted smoking marijuana on a daily basis because Ms. Newell's friends smoked marijuana. Her mother was surprised by Ms. Newell's use of Xanax and Ecstasy. Her mother knew that Ms. Newell had minor traffic violations, previously had been arrested for theft, and had violated the terms of her probation on one prior occasion. Her mother was unaware of the prior drug convictions.

Ms. Newell offered an allocution in which she said she was sorry "for the crimes [she] was accused of two years ago." She apologized to the victim and said she "could have made a better choice that day, but [she] was also scared." She stated that while

incarcerated, she attended church services and Alcoholics Anonymous meetings and completed a recovery program.

In making its sentencing decisions, the trial court considered the evidence presented at trial and during the sentencing hearing, the presentence reports, the principles of sentencing, arguments made as to sentencing alternatives, the nature and the characteristics of the criminal conduct, the evidence offered by the parties regarding mitigating and enhancing factors, any statistical information as to sentencing practices for similar offenses in Tennessee, the allocutions made by both defendants, the victim's statement, and the defendants' potential for rehabilitation or treatment.

The trial court found that Mr. Morales was a Range II, multiple offender and that Ms. Newell was a Range I, standard offender. The trial court applied the following enhancement factors to both Mr. Morales and Ms. Newell: (1) each of the defendants "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (5) they either "treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense"; (6) the amount of damage to property taken from the victim was particularly great; (8) before trial or sentencing, both Mr. Morales and Ms. Newell "failed to comply with the conditions of a sentence involving release into the community"; (9) as applicable to the aggravated burglary and theft convictions, the defendants "possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense"; (10) they "had no hesitation about committing a crime when the risk to human life was high"; and (12) at the times that the felonies were committed Mr. Morales was released on parole, and Ms. Newell was released on bail. T.C.A. § 40-35-114(1), (5), (6), (8), (9), (10), (12). The trial court also found that Mr. Morales was "a leader in the commission of an offense involving two (2) or more actors." T.C.A. § 40-35-114(2). The trial court considered Mr. Morales's employment as a mitigating factor. *See* T.C.A. § 40-30-113(13).

The trial court merged the aggravated robbery and theft convictions and the two aggravated burglary convictions. The trial court sentenced Mr. Morales to twenty years for the aggravated robbery and aggravated burglary convictions and eight years for the conspiracy conviction. The trial court sentenced Ms. Newell to ten years for the aggravated robbery and aggravated burglary convictions and four years for the conspiracy conviction. The trial court ordered Mr. Morales and Ms. Newell to serve their sentences consecutively, for effective sentences of forty-eight years and twenty-four years, respectively.

In imposing consecutive sentences, the trial court found both Mr. Morales and Ms. Newell were "offender[s] whose record of criminal activity is extensive"; and "dangerous

offender[s] whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(2), (4). The trial court reviewed the facts and circumstances of the case, noting that the Defendants planned to commit the home invasion while the victim was there, that the intruders were armed, and that the intruders pointed a loaded gun at the victim's head. The trial court found "there was a risk to human life that was very high to all of these people, not just to … the victim."

## B. Consecutive Sentencing

Mr. Morales challenges the trial court's finding that he had an extensive record of criminal activity, arguing that two prior convictions do not constitute an extensive record. He also challenges the trial court's finding that he is a dangerous offender, asserting that the trial court erroneously based its finding upon the conduct of the co-defendants rather than Mr. Morales's own conduct and that the trial court failed to find the additional factors set forth in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). Ms. Newell does not specifically challenge the trial court's findings that she had an extensive record of criminal activity or that she was a dangerous offender. Rather, she maintains that the imposition of consecutive sentences resulted in an effective sentence that is "greater than that deserved for the offense committed" and is not "justly deserved in relation to the seriousness of the offense." *See* T.C.A. §§ 40-35-102(1), -103(2).

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). This court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The decision to impose consecutive sentences rests within the sound discretion of the trial court. *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010). The standard of review for consecutive sentencing is abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

To impose consecutive sentencing, the trial court must find by a preponderance of the evidence at least one of seven factors listed in Tennessee Code Annotated section 40-35-115(b), which include: (2) "The defendant is an offender whose record of criminal activity is extensive" and (4) "The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." The trial court need only find one of the criteria listed in the statute to properly impose a consecutive sentence. *State v. Alder*, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001). When basing its consecutive sentencing determination on the "dangerous offender classification, the trial court must conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *Wilkerson*, 905 S.W.2d at 938). Consecutive sentencing must be "justly deserved in relation to the seriousness of the offense," and "no greater than that deserved for the offense committed." T.C.A. §§ 40-35-102(1), -103(2); *see State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

Although Mr. Morales maintains that he does not have an extensive history of criminal conduct because he has only two prior convictions, the application of this factor is not based solely upon prior convictions. This court has recognized that "'[c]urrent offenses may be used in determining criminal history for the purposes of consecutive sentencing.'" *State v. Terry Patterson*, No. W2017-01481-CCA-R3-CD, 2018 WL 4677522, at *12 (Tenn. Crim. App. Sept. 28, 2018), *perm. app. denied* (Tenn. Jan. 18, 2019) (quoting *State v. Carolyn J. Nobles*, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App. Mar. 7, 2007)). Furthermore, "'an extensive record of criminal activity may include criminal behavior which does not result in a conviction.'" *State v. Koffman*, 207 S.W.3d 309, 324 (Tenn. Crim. App. 2006) (quoting *State v. William L. Vaughn*, No. M2002-01879-CCA-R3-CD, 2003 WL 21877929, *5 (Tenn. Crim. App. Aug. 1, 2003), *perm. app. denied* (Tenn. Dec. 22, 2003)); *see State v. Gregory Gill*, No. W2018-00331-CCA-R3-CD, 2019 WL 549651, at *18 (Tenn. Crim. App. Feb. 11, 2019), *perm. app. denied* (Tenn. May 16, 2019). The record reflects that Mr. Morales had prior convictions for aggravated robbery and attempted robbery, was released on parole for those convictions a few months prior to committing the instant offenses, was admittedly selling drugs while on parole, was convicted of multiple felonies in the instant case, and admitted to helping Raoul escape from the police following the commission of the offenses. We conclude that the trial court properly found that Mr. Morales was an "offender whose record of criminal activity is extensive." *See* T.C.A. § 40-35-115(b)(2). Although Mr. Morales contends that the trial court did not make the findings necessary to order consecutive sentences based upon the "dangerous offender" factor, "an extensive criminal history, standing alone, is enough to justify the imposition of consecutive sentencing." *State v. Nelson*, 275 S.W.3d 851, 870 (Tenn.

Crim. App. 2008). We conclude that the trial court properly exercised its discretion in ordering Mr. Morales to serve his sentences consecutively.

The record also supports the trial court's finding that Ms. Newell had an extensive record of criminal activity. *See* T.C.A. § 40-35-115(b)(2). Ms. Newell has numerous prior misdemeanor convictions that spanned over a number of years, had violated the terms of probation on multiple occasions, had an extensive history of illegal drug use, had multiple charges pending and was released on bond for those charges when she committed the instant offenses, and was convicted of multiple felonies as a result of her participation in the instant offenses. Although Ms. Newell maintains that her effective sentence was "greater than deserved for the offenses committed" and was not "justly deserved in relation to the seriousness of the offense," the trial court made extensive findings regarding the serious nature of the offenses and the threat to the lives of the victim and others caused by the conduct of Ms. Newell and her co-defendants. We conclude that the trial court did not abuse its discretion in ordering Ms. Newell to serve her sentences consecutively.

## CONCLUSION

We conclude that the Defendants are not entitled to relief, and we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE